**United States District Court**
**Northern District of Indiana**
**Hammond Division**

JASON R. CRAIG,                    )
                                   )
            Plaintiff,             )
                                   )        Civil Action No.  2:13-CV-92 JVB
      v.                           )
                                   )
DAVID LANE, *et al.*,              )
                                   )
            Defendants.            )

## OPINION AND ORDER

        Jason R. Craig, a *pro se* prisoner, was granted leave to proceed on claims that he was

denied adequate medical and dental care while housed at the Porter County Jail.  (DE 13.) The

defendants seek summary judgment, arguing that the undisputed facts establish that they were

not deliberately indifferent to any of Craig's medical or dental needs. (DE 100, 106.)

## I.    Motions for Summary Judgment

## A.    Facts

        Jason R. Craig ("Craig") was booked into the Porter County Jail on September 13, 2012.

*(DE 108, Ex. C at 1, 3-4.)* When he arrived at the jail Craig reported taking a number of

medications, including Methadone, Xanax, Soma, Wellbutrin, and Cymbalta.  (DE 108, Ex. C at

1.)  He also reported having anxiety, withdrawal, sciatica and schizoaffective disorder.  (*Id.*)

        The Porter County Jail's medical staff includes both employees of Advanced

Correctional Healthcare, Inc.[1] ("ACH") and the Porter County Sheriff's Department. The

medical staff employed by ACH consists of Kim House, R.N., and Dr. Nadir Al-Shami. *(Aff. of*

*Kim House ¶ 1.)* As a registered nurse, Kim House was responsible for triaging inmates,

---

[1]A private company which provides medical care at the Porter County Jail.

communicating information to the doctor, and following Dr. Al-Shami's orders regarding treatment. (*Id.*) As a registered nurse, Kim House does not issue treatment orders or prescribe medications. (*Id., ¶ 3.*) Dr. Al-Shami determines the course of treatment for a particular inmate and Kim House implements those orders and that treatment plan. (*Id.; Aff. of Dr. Al-Shami, ¶ 2.*) When inmates enter a jail that Dr. Al-Shami is responsible for, they become Dr. Al-Shami's patient, regardless of the length of time they are in the jail. (*Id.*) Because Dr. Al-Shami becomes the inmates' primary care physician when they enter the jail, he prescribes what medication he thinks is medically necessary and appropriate for the patient. (*Id.*)

The nurses and medical assistants at the Porter County Jail who were employed by the Porter County Sheriff's Department included Cheryl Casko, Dawn Murray (also known as and hereinafter referred to as "Dawn Martin"), Cashan Walker, and Alisa Fraticelli. (*Id.*) In addition, Michele D. Harris is currently employed by the Porter County Sheriff as the Director of Nursing and she began her employment in that capacity on January 28, 2013. (*Aff. of Michele D. Harris, ¶3*).

The day after Craig arrived at the jail, Nurse Fraticelli noted that he was withdrawing from a variety of drugs including Heroin, Xanax, Norco and Orthodone. (*DE 108-3, Exhibit C, p. 28; Aff. of Dr. Al-Shami, ¶ 4.*) She called Dr. Al-Shami about Craig's condition, and he ordered Vistaril and Donnatol for 5 days and that blood pressure be checked twice a day for 5 days. (*Id.*) Vistaril, Donnatol and blood pressure checks is a common protocol used to prevent and control withdrawal from illegal and prescription drugs. *(Aff. of Dr. Al-Shami, ¶ 4.)*

On September 18, 2012, Craig had his medical screening done by Nurse Martin. *(DE 108-3, Exhibit C, p. 5.)* His vital signs were taken and were within normal limits. (*Id.*) Craig

informed Nurse Martin that he had schizoaffective disorder, anxiety and depression. (*Id.*) He reported being on Thorazine, Xanax, Neurontin, Wellbutrin, Norco, Soma and Cymbalta. (*Id.*) Nurse Martin called the various pharmacies that Craig claimed dispensed his medication. (*Id.*) She was able to confirm that all of his medications were current except Neurontin. (*Id.*) Nurse Martin called Dr. Al-Shami, who ordered blood pressure checks twice a day for 5 days. (*DE 108-3, Exhibit C, p. 5; Aff. of Dr. Al-Shami, ¶ 5.*) Dr. Al-Shami did not prescribe any medications at that time because he thought it prudent to make sure Craig was through any withdrawal and wanted to see him personally before he decided what psychiatric medication was best for him. (*Aff. of Dr. Al-Shami, ¶ 5.*)

Craig submitted a Medical Request Form on September 20, 2012 stating that he wanted his diet changed and he wanted to talk to the doctor about his medication. (*DE 108-3,Exhibit C, p. 61.*) Nurse Walker responded the next day that he would see the doctor. (*Id.*) On September 21, 2012, Craig submitted a Medical Request Form about his psychiatric medication. (*Id., p. 62.*) Nurse Walker responded the next day and informed Craig that he was on the list to see the doctor. (*Id.*) Dr. Al-Shami examined Craig on September 25, 2012. (*DE 108-3,Exhibit C, p. 7; Aff. of Dr. Al-Shami, ¶ 7.*) Craig complained of withdrawal symptoms and nervousness. (*Id.*) Dr. Al-Shami's diagnosis was schizoid affective disorder and drug addiction and he prescribed Thorazine for Craig's mental health issues. (*Id.*)

On October 1, 2012, Craig submitted a Medical Request Form complaining of the side-effects of Thorazine. (*Id., p. 8 and 63.*) He said the medication was helpful, but requested Artane to help with the side effects. (*Id.*) Nurse Walker responded to his request and informed Craig that he would see the doctor as soon as practical. (*Id.*) Craig submitted another Medical Request

3

Form on October 6, 2012, stating that he was experiencing symptoms associated with major depressive disorder and was unable to sleep. (*Id., p. 64.*) He also stated that he was experiencing withdrawal and had thoughts of death, dying, and helplessness. (*Id.*) He further reported that his lower back was "fucked" and his entire body was cramped and he had shooting numbness down his right leg. (*Id.*) Nurse Walker responded the next day that she would refer him to the doctor. (*Id.*)

Dr. Al-Shami examined Craig on October 9, 2012. *(DE 108-3, Exhibit C, p. 9; Aff. of Dr. Al-Shami, ¶8.)* His vital signs were taken and were within normal limits. (*Id.*) Craig complained of side-effects of Thorazine and back pain. (*Id.*) Upon examination, Dr. Al-Shami noted that Craig had no limitation of back movement. (*Id.*) Dr. Al-Shami prescribed Artane, which is a medication that helps control side effects of psychiatric medication. (*Id.*) Dr. Al-Shami did not prescribe any medication for Craig's complaints of back and nerve issues at this time. He found Craig's mental health symptoms were a priority and he wanted to get those under control before he addressed Craig's less serious physical complaints. (*Aff. of Dr. Al-Shami, ¶8.*) In Dr. Al-Shami's experience, a patient is more clear and objective about his physical complaints once his mental health issues are stable. (*Id.*) Furthermore, there was nothing concerning on physical exam that suggested any medication was necessary at that point and some of Craig's symptoms could have been side effects of his mental health medication. (*Id.*)

Craig submitted a Medical Request Form on December 15, 2012, complaining that his wisdom tooth was throbbing and his gum above it was swollen, bleeding and painful. (*DE 108-3, Ex. C., p. 65.*) Nurse Walker responded the next day that she would place Craig on the list to see the dentist. (*Id.*) For the two following weeks, Craig informed Nurse Walker that he was having

a difficult time eating. (*DE 9 at 6*.) On an almost daily basis, he would ask her for antibiotics and pain medication. (*Id*.) However, she did not provide him with anything. (*Id*.)

Craig submitted a Medical Request Form on December 20, 2012 that he wanted back on Wellbutrin because his depression was getting worse. (*Id., p. 66.*) Nurse Walker responded the next day that he would be scheduled to see the doctor. (*Id*.) On January 3, 2013, Dr. Al-Shami examined Craig. (*DE 108-3, Exhibit C, p. 12; Aff. of Dr. Al-Shami, ¶10.*) Craig complained that Thorazine was not helpful. (*Id*.) Dr. Al-Shami therefore discontinued Thorazine and prescribed Haldol and Artane instead. (*Id*.)

Though there is no record of it, Craig asserts he submitted a formal grievance to Captain Taylor regarding his dental issues on December 30, 2012. (*DE 9 at 6*.) Craig did not receive a response. (*Id*.) Then, in early January 2012, Craig went to Dr. Al-Shami for mental health issues. (*Id*.) Though the progress notes do not reflect it, Craig claims he told Dr. Al-Shami that he was experiencing pain because of his tooth and gums. (*Id*.) Dr. Al-Shami did not provide Craig with any medication, instead informing Craig that he would have to see the dentist. (*Id*.)

On January 6, 2013, Craig submitted a Medical Request Form that he wanted his side-effect medication increased. (*DE 108-3, Exhibit C, p. 67*.) Nurse Walker responded the next day and informed Craig that he would see the doctor as soon as practical. (*Id*.) On January 9, 2013, Craig refused his Haldol and signed a refusal form. (*Id., p. 13.*)

Craig again claims to have submitted a formal grievance on January 13, 2013. This time to Assistant Warden Ron Gaydos. (*DE 9 at 7*.) Though there is no record of any such grievance being filed, Craig claims that he complained about his need to see the dentist. (*Id*.) Craig never received a response to this grievance. (*Id*.)

Dr. Al-Shami examined Craig on January 17, 2013. *(DE 108-3, Exhibit C, p. 14; Aff. of Dr. Al-Shami, ¶11.)* Craig's vital signs were taken and were within normal limits. (*Id.*) Craig complained of side-effects from Haldol. (*Id.*) Dr. Al-Shami increased Artane and adjusted the Haldol dose. (*Id.*) While the records do not reflect it, Craig again claims he told Dr. Al-Shami of his tooth and accompanying pain. *(DE 9 at 7.)* Dr. Al-Shami again told Craig that he must see the dentist. (*Id.*) Craig informed Dr. Al-Shami that he was on the waiting list to see the dentist. (*Id.*)

For the next ten days, Craig would ask Nurses Walker and Martin for help regarding his tooth and gum pain each time they were passing out medication. (*Id.*) The nurses said they could not give him anything and that he would be seeing the dentist soon. (*Id.*) On January 27, 2013, Craig began refusing his food trays because the pain in his mouth was so extreme that he was unable to eat. (*Id.*) On January 30, 2013, Warden Widup met with Craig and asked why he was refusing his food trays. (*Id. at 8.*) Craig told the warden about his dental issues and how his requests for an examination and treatment have been denied. (*Id.*) Warden Widup offered to help Craig. (*Id.*)

On January 30, 2013, an inmate named Hector Candalaria offered Craig some salt that he had previously received from the dentist. (*Id.*) Craig began packing his tooth in salt in an attempt to lessen the pain and kill any infection. (*Id.*) During this time, Craig continued to ask Nurses Walker and Martin for pain medication and antibiotics, but those requests were denied. (*Id.*)

Craig submitted a Medical Request Form on January 30, 2013 asking to see a psychiatrist or other qualified medical professional. *(DE 108-3, Exhibit C, p. 68.)* Nurse Walker responded

the next day that he could see the doctor and to let medical know if he wanted an appointment. (*Id*.)

On February 1, 2013, Craig was scheduled to see the dentist, but the dentist had to reschedule his appointments to February 8, 2013. *(DE 108-3, Exhibit C, p. 30*.) A nurse assessed Craig on that date and found he had no fever and he reported that his tooth was better and not bothering him. (*Id*.) He also reported that he could chew without difficulty. (*Id*.) The nurse advised Craig to submit a medical request form if his tooth became worse. (*Id*.) Craig saw the dentist on February 8, 2013 and he was advised that he had a peri-abscess from food impaction. *(Id., p. 15*.) The dentist advised him that he was getting over an infection. (*DE 9 at 8*.) Craig informed the dentist that he had been packing his tooth with salt he received from another inmate. (*Id*.) The dentist advised that there was no further action necessary at that time. (*Id*.) Neither Warden Widup, Assistant Warden Gaydos nor Dawn Martin recalls Craig ever making a complaint to him about his tooth. (*See Widup Aff., DE 101-1 at 49-50*; *See Gaydos Aff., DE 101-1 at 52-53*; *See Martin Aff., DE 101-1 at 55-56*).

On February 11, 2013, Craig submitted a Medical Request Form to see the doctor to get on Wellbutrin for major depressive disorder and Neurontin for sciatica. *(Id., p. 69*.) He also wanted back on Thorazine instead of Haldol and he wanted his Artane increased. (*Id*.) Nurse Fraticelli responded the next day that he was on the list to see the doctor. (*Id*.) Dr. Al-Shami examined Craig on February 14, 2013. *(DE 108-3, Exhibit C, p. 16; Aff. of Dr. Al-Shami, ¶12*.) Craig requested Wellbutrin, Thorazine, and Neurontin and complained of his sciatica. (*Id*.) He complained that Haldol did not work for his auditory hallucinations. (*Id*.) Dr. Al-Shami discontinued Haldol and placed Craig back on Thorazine, per his request. (*Id*.) Dr. Al-Shami did

not prescribe any medication for Craig's sciatica because he had just switched Craig's psychiatric medication. (*Id.*) He wanted to get the psychiatric medication stable before he addressed the complaints of sciatica. (Id.) Notably, Dr. Al-Shami did not perceive the sciatica as a serious health concern, especially since Craig did not describe any specific symptoms. *(Aff. of Dr. Al-Shami, ¶12.)* On February 15, 2013, Craig submitted a Medical Request Form to Nurse Harris that the doctor should address more than one issue at a time because he had three issues that required treatment. (*DE 108-3, Exhibit C, p. 70.*) A staff member responded three days later that Craig needed to provide the specific details of his symptoms. (*Id.*) Craig submitted two Medical Request Forms on February 19, 2013, providing that he was experiencing painful neuralgia and sciatica with pain shooting down his right leg all the way to his toes and that he needed an extra mat. (*Id., pp. 71-72*.) He also reported worsening symptoms of depression, including sadness, inability to sleep, isolation, not having an appetite and random thoughts. (*Id.*) Nurse Fraticelli responded to both requests the next day that he was on the list to see the doctor. *(Id., pp. 71-72 and 30.)*

On February 21, 2013, Dr. Al-Shami examined Craig. *(DE 108-3, Exhibit C, p. 17; Aff. of Dr. Al-Shami, ¶13.)* Craig complained of right-sided shooting pain down his leg, numbness, and tingling. (*Id.*) He reported taking Neurontin prior to his incarceration. (*Id.*) Dr. Al-Shami assessed him with neuropathy of the right leg and prescribed Neurontin (Gabapentin) 300 mg, which is a drug used to treat nerve pain. (*Id.*)

Craig submitted a Medical Request Form on February 23, 2013 that he was having mental health issues and needed to see a mental health professional. *(DE 108-3, Exhibit C, p. 73.*) He reported suffering from serious disorders and asked to see Porter Starke Services. (*Id.*) A

medical staff member responded two days later that Dr. Al-Shami was addressing his issues with the medication he had asked for and that Porter Starke was not contracted with the jail. (*Id.*) On February 28, 2013, Craig requested a mattress. *(Id., p. 31.)* The nurse referred him to the warden and the doctor. (*Id.*) Dr. Al-Shami examined Craig on February 28, 2013 because Craig wanted Wellbutrin for his depression. *(DE 108-3, Exhibit C, p. 18; Aff. of Dr. Al-Shami, ¶14.)* Craig's vital signs were taken and were within normal limits. (*Id.*) Dr. Al-Shami gave Craig the choice between Wellbutrin and Thorazine and Craig chose Thorazine. (*Id.*)

On March 4, 2013, Craig submitted a Medical Request Form that he was on two anti-depressants when he came to the jail and he needed to see someone to address his mental health issues and depression. *(DE 108-3, Exhibit C, p. 74.)* Around that same time, Sheriff David Lain received a letter from Craig requesting that he be seen and treated by a physician. *(Aff. Sheriff Lain, DE 101-1 at 58-59.)* Pursuant to Sheriff Lain's instructions, Craig was taken to Porter Starke Services on March 11, 2013 for mental health care. (*DE 108-3, Exhibit C, pp. 19-20; See DE 108-5, Ex. E pp. 16-19; DE 101-1, Aff. of Sheriff Lain, at 58-59.*) Craig requested Wellbutrin and Porter Starke Services recommended that they monitor Craig's medication monthly. (*Id.*) Michelle Harris called Porter Starke Services on April 14, 2013 to let them know that she had just been informed that Craig had been passing his medications to other inmates. *(DE 108-5 Exhibit E, p. 18.)* Per Dr. Goldstein at Porter Starke Services, it was unclear if Craig truly needed more medication. (*Id.*)

On April 3, 2013, Craig submitted a Medical Request Form that he had an inadequate mat that was very thin with no pillow. *(DE 108-3, Exhibit C, p. 75.)* He claimed he had documented sciatic nerve disorder and he had a "pins and needles" feeling in his right leg. (*Id.*)

A medical staff member responded two days later and reminded Craig that he was on medication for sciatica. (*Id.*) Also on April 3, 2013, Nurse Fraticelli noted that Craig was continually hoarding his medication. (*Id., p. 31.*) She discussed the issue with Dr. Al-Shami and Dr. Al-Shami ordered Gabapentin Liquid twice a day and Artane Liquid twice a day. *(DE 108-3, Exhibit C, p. 31; Aff. of Dr. Al-Shami, ¶15.)* Dr. Al-Shami also discontinued Thorazine and instead prescribed a Risperdal injection monthly. (*Id.*) According to Dr. Al-Shami, inmates who hoard their medication pose a danger to themselves and others and it is common to substitute crushed or liquid medication, which are much more difficult to hoard. *(Aff. of Dr. Al-Shami, ¶15.)* A Risperdal monthly injection would address Craig's mental health problems without the risk of hoarding. (*Id.*) On April 7, 2013, Craig submitted a Medical Request Form that he wanted a second opinion about whether his medications should be increased or changed. *(Id., p. 76.)* A medical staff member responded two days later that he could request a doctor visit to speak to Dr. Al-Shami about his medical problems. (*Id.*) On April 8, 2013, Dr. Al-Shami ordered a Risperdal 50 mg. monthly injection. *(DE 108-3, Exhibit C, p. 22; Aff. of Dr. Al-Shami, ¶16.)*

On April 9, 2013, Craig had no complaints during the morning nursing shift. *(DE 108-3, Exhibit C, p. 31.)* He was given liquid medications without issue or complaint and he said he understood why Thorazine was discontinued and Risperdal was prescribed instead. (*Id.*) Craig said he would try the shot at least once to see how it made him feel. (*Id.*) Craig filed a grievance form on April 14, 2013 stating that he requested to see the doctor two weeks ago regarding his pain, but that Nurse Harris denied him because he was already on medication. *(Id., p. 77.)* A staff member responded the next day and informed Craig that he had a doctor visit scheduled. (*Id.*)

Craig went to Porter Starke Services on April 16, 2013 for mental health care. (DE 108-5, *Exhibit E, pp. 10-15.*) He reported a 12-year history of depression and excessive use of opiates. (*Id.*) He claimed he heard voices in jail and was not on an antidepressant. (*Id.*) Craig's conversation with the mental health provider focused mainly on jail conditions and his worry over a possible lengthy prison sentence. (*Id.*) The mental health provider recommended an increase in Artane, decrease in Risperdal and to start Wellbutrin. (*Id.*)

Dr. Al-Shami examined Craig on April 18, 2013. *(DE 108-3 Exhibit C, p. 23; Aff. of Dr. Al-Shami, ¶17.)* Craig wanted the Neurontin increased due to pain in his legs. (*Id.*) Dr. Al-Shami increased Craig's Neurontin per his request. (*Id.*) Craig also submitted a Medical Request Form and stated that the psychiatrist told him they would be changing his medication. (DE 108-3, *Exhibit C, p. 78.*) A staff member responded on April 22, 2013 that as of this morning, Porter Starke Services had not communicated any changes to his medication but that she would call to verify. (*Id.*) Craig submitted a grievance on April 21, 2013 that he went to the psychiatrist a few days prior and was told his Artane dose would be adjusted and Wellbutrin would be added, but he had not received those changes. *(Id., p. 79.)* On April 22, 2013, a nurse from Dr. Johns' office at Porter Starke Services called the jail and informed them that Dr. Johns had ordered a decrease in Risperdal. *(Id., pp. 79 and 31.)* A nurse notified Dr. Al-Shami and Craig that Porter Starke Services called and gave a telephone order to decrease his Risperdal only. *(DE 108-3, Exhibit C, pp. 79 and 31; Aff. of Dr. Al-Shami, ¶18.)* On April 23, 2013, Porter Starke Services sent a note to the jail prescribing Risperdal, continuing Artane, discontinuing Wellbutrin, and that Craig needed a follow-up appointment the week of May 13, 2013. *(DE 108-3, Exhibit C, p. 24.)* Craig submitted a Medical Request Form on April 25, 2013 that he was having side-effects from the

shot he received and his side-effect medicine needed to be increased. *(Id., p. 80.)* He claimed that

Porter Starke Services told him it would be increased but for some reason that had not occurred.

*(Id.)* A staff member responded and informed Craig that he had a scheduled follow-up

appointment at Porter Starke and asked him to describe his side-effects. *(Id.)*

On April 26, 2013, Craig filed his amended complaint in this case. (DE 9.)

In Harris' professional opinion and to a reasonable degree of medical certainty,

the treatment which Craig received for his sciatica, consisting of the administration of

Gabapentin, was in accord with standard and customary medical practices. *(Aff. of Harris,*

*¶22).* In her professional opinion, Craig is currently receiving adequate and appropriate

mental health care and treatment from the Porter County Jail through the referral to Porter Starke

Services, Inc. *(Aff. of Harris, ¶23).* Similarly, in Dr. Al-Shami's opinion, the medical care that he

and the medical staff at the Porter County Jail rendered to  Craig was reasonable, appropriate,

and within the applicable standard of care. *(Id., ¶21.)* Dr. Al-Shami treated  Craig based on

subjective complaints, objective symptoms, and his medical judgment. *(Aff. of Dr. Al-Shami,*

*¶22.)* When treating mental health patients, it is common to try a variety of medications until a

physician finds one medication or combination of medication that works best for the patient. *(Id.,*

*¶24.)* Dr. Al-Shami considers the patient's reported side effects and how the patient reports the

medication works to control his or her mental health symptoms. *(Id.)*

ACH, including Kim House and Dr. Al-Shami, was not responsible for providing dental

treatment to inmates in the Porter County Jail. *(Aff. of Kim House, ¶8; Aff. of Dr. Al-Shami, ¶25.)*

Instead, it was the Sheriff's Department and its staff that were responsible for coordinating

dental care for the Porter County Jail inmates. *(Id.)* Neither Kim House nor the ACH doctor had

any control over when the dentist would come to the jail to see inmates. *(Aff. of Kim House, ¶8.)* The dentist that the Porter County Jail utilized was Dr. Carter. (*Id*.) Dr. Carter typically came to the jail twice a month. (*Id*.) If an inmate asked to see the dentist or presented a dental problem, all Kim House could do was put that inmate on the list to see the dentist the next time the dentist was at the jail. (*Id*.) If the inmate presented an urgent need that the jail doctor could address, the jail doctor could see the inmate while he waited for the dentist to come to the jail. (*Id*.) Inmates were also given salt water gargles to reduce irritation and swelling while they waited to see the dentist. (*Id*.) If an inmate had obvious swelling, redness, or complained of pain, sometimes the dentist would issue a telephone order for antibiotics and Tylenol or ibuprofen. (*Id*.)

## B. Analysis

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate, however, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v.*

*Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is warranted. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

### 1) Medical care

As a preliminary matter, it appears Craig was both a pretrial detainee awaiting trial on various charges, and also a convicted inmate serving a sentence during the events in this case. While he was a pretrial detainee the Fourteenth Amendment applied, whereas the Eighth Amendment applied while he was serving a sentence. *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009). Though there are differences between the two amendments, "anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment." *Id.*

To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994.) A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and if untreated could result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Deliberate indifference is a high standard, and is "something approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). As the Seventh Circuit has explained:

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005).

For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir.1997). Where the defendants have provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Synder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere

disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

Craig was granted leave to proceed on his allegations that Warden Widup, Nurse Harris, Kim House, Nurse Walker[2], Nurse Martin and Dr. Al-Shami were all aware of his medical problems, but delayed providing him treatment. At this stage, the defendants do not dispute that Craig's mental illness and back pain constitute objectively serious conditions. Instead, the defendants claim that they were not deliberately indifferent to either of those conditions.

To start, Craig's main complaint centers around the overall plan of care prescribed by Dr. Al-Shami and which was followed and implemented by the various nurses of the Porter County Jail medical staff. To survive summary judgment on his theory that Dr. Al-Shami denied him constitutionally adequate treatment, Craig needed to present evidence that "no minimally competent" doctor would have chosen that course of treatment. *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008). This he has not done.

As to the plan of care for his mental illness, the medical records show that the defendants provided Craig with appropriate care. The records reflect Dr. Al-Shami met regularly with Craig since his arrival at the jail, prescribed him various medications, and monitored his condition in an effort to get his mental illness under control. Craig complains that he was not allowed to continue all of his mental health prescription medications when he entered the jail. However, this was not the result of deliberate indifference. Instead, Dr. Al-Shami wanted to make sure Craig was through any withdrawal and to see him personally before prescribing any psychiatric

---

[2]In his response brief, Craig argues only that Nurse Walker was deliberately indifferent to his need for dental treatment. (DE 113 at 7.) As such, it appears Craig has abandoned his claim against her regarding medical treatment. Consequently, based on the undisputed evidence, Nurse Walker is entitled to summary judgment on Craig's claim regarding lack of adequate medical treatment.

medication.  (*Id. at 5.*)  After Craig was through withdrawal, Dr. Al-Shami tried Craig on a

variety of medications to alleviate his mental illness complaints. It is clear that Dr. Al-Shami

diligently worked with Craig to alleviate his mental health problems. When Craig would

complain of a particular medication or request a different one, Dr. Al-Shami changed his

medication.  Even when Craig was accused of hoarding his medication, Dr. Al-Shami did not

discontinue it.  Instead, he changed his medication orders to liquid or injectable medication to

reduce the risk of hoarding. After months of Dr. Al-Shami treating Craig for mental health

symptoms, the defendants referred him to Porter Starke, an outside mental health facility. At no

time, did Dr. Al-Shami or any other defendant act deliberately indifferent to his mental illness.

Likewise, the records also demonstrate that Dr. Al-Shami's plan of care for Craig's back

pain and sciatica was appropriate. It is true that Craig was not initially given pain medication for

his back. However, this was not the result of any deliberate indifference. Instead, it was based on

the medical opinion of Dr. Al-Shami. Dr. Al-Shami initially examined Craig and did not find the

back pain or sciatica were serious medical issues. Dr. Al-Shami noted that if any pain existed, it

did not result in any limitation of movement. Moreover, it could not be confirmed if Craig was

taking any medication for these conditions prior to his admission into the jail. In his professional

medical opinion, Dr. Al-Shami decided to get Craig's mental health symptoms under control

before prescribing medication for those complaints. When Dr. Al-Shami did find that it was

proper to treat Craig's back pain, he prescribed him the same medication Craig reported taking

prior to becoming incarcerated and he also prescribed Ibuprofen. While Craig would have liked

to be given these medications sooner, his disagreement with Dr. Al-Shami's medical judgment

over the proper course of treatment does not establish an Eighth Amendment violation. *Berry*, 604 F.3d at 44.

The undisputed evidence also establishes that the nurses involved in his medical and mental health treatment did not have the ability to independently alter or change Dr. Al-Shami's plan of care. Instead, they were obligated to adhere to it. And, there is nothing in the record to establish that following that plan of care caused any of them to "ignore an obvious risk" to Craig's health or safety. *See Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) (a nurse acts with deliberate indifference when she "ignores obvious risks to an inmate's health."). Nor is there any evidence that any of other medical personnel or defendant delayed or interfered with that plan of care.

In addition to his generalized complaints as to his overall plan of care, Craig raises a number of pointed allegations, which will be addressed in turn. First, as to Nurse Martin and Kim House, Craig complains that when he arrived at the jail he was withdrawing from a variety of prescription and illegal drugs and complains that they did not do enough to help him. He asserts that they witnessed him go through withdrawal but did not provide him with any treatment. (*DE 113 at 6; DE 114 at 4-5*.) While these two individuals may not have treated his withdrawal, other medical professionals did. It was Nurse Fraticelli who noticed that Craig was in drug withdrawal soon after arriving at the jail. She then called Dr. Al-Shami, who promptly prescribed a common protocol to prevent and control Craig's withdrawal symptoms. (*Aff. Dr. Al-Shami at ¶ 4.*) Craig's withdrawal symptoms were treated timely and appropriately. Thus, he was provided treatment for his withdrawal and his claims against Nurse Martin and Kim House are without merit.

As to Warden Widup, Craig now admits that he has been helpful in ultimately getting mental health treatment at Porter Starke. (DE 113 at 8.) Craig nevertheless brings a claim against him for initially deferring to medical staff in deciding when to send Craig to Porter Starke. Simply put, Craig believes Warden Widup should have sent him to Porter Starke sooner. While Craig does not like it, the law encourages non-medical staff to defer to the judgment of medical personnel. *See Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009). Here, it was entirely reasonable and proper for Warden Widup to initially defer to the medical personnel's decision regarding Craig's mental health care. Without more, Craig's claim against Warden Widup cannot proceed.

As to Nurse Harris, Craig complains that she informed various health care providers that he had been hoarding his medications. (DE 113 at 2-4.) However, there are no facts to suggest Nurse Harris made these statements in an attempt to interfere with his health care. To the contrary, even though Craig denies hoarding the medication, he admits that jail officials believed and were concerned that he was doing so. If anything, Nurse Harris's statements were intended to keep Craig safe from overdosing or from passing medication to other inmates. In either case, certainly Nurse Harris's actions did not rise to constitutionally inadequate treatment. Moreover, there is nothing in the record to show that Nurse Harris's actions caused Craig to be denied or delayed in getting any treatment.

Next, Craig raises an official capacity claim against ACH based on an alleged unlawful policy at the jail regarding the medical treatment provided to inmates. A suit against a government officer in his official capacity is treated as a suit against the municipality itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). There is no general *respondeat superior* liability

under Section 1983, and instead a municipality will be held liable only if the plaintiff establishes a policy or custom that violates the plaintiff's constitutional rights. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978); *Schor v. City of Chicago*, 576 F.3d 775, 779 (7th Cir. 2009). In order to support such a claim, however, the plaintiff must begin by showing an underlying constitutional violation. *Schor*, 576 F.3d at 779.

Here, Craig claims that the jail has an unconstitutional policy of denying all new inmates their medications. As stated above, Craig has failed to prove that his Eighth Amendment rights were violated, and without an underlying constitutional violation his policy claim cannot proceed. *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014). Even assuming Craig could establish an underlying constitutional violation, he has not come forward with any evidence that such a policy exists; instead, the evidence is that medication will be provided if ordered by a jail physician. For these reasons, ACH is entitled to summary judgment on Craig's policy claim.

Finally, Craig has brought a claim against Sheriff Lain in his official capacity for injunctive relieve in connection with his current care. However, Craig is no longer in custody at the Porter County Jail. When "a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to be retransferred." *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (quotation marks and citations omitted). There is no evidence or argument to suggest Craig will be retransferred to Porter County Jail. Therefore, this claim is denied as moot.

**2) Dental care**

As stated above, Craig has a right to adequate medical treatment, and this includes

treatment for dental problems. *See Berry*, 604 F.3d at 440 (tooth decay and serious tooth pain

which ultimately required a root canal constituted objectively serious medical condition);

*Farnham*, 394 F.3d at 480–81 n.4 (observing that tooth problems can lead to bacterial infections

or coronary problems, either of which could cause serious injury or even death). Craig was

granted leave to proceed on his allegations that Warden Widup, Assistant Warden Gaydos,

Captain Ron Taylor, Nurse Walker, Nurse Martin, and Dr. Al-Shami were all aware of his dental

problems, but delayed providing him treatment. At this stage, the defendants do not dispute that

the "peri abscess" constitutes an objectively serious condition.  Instead, the defendants claim that

they were not deliberately indifferent to this condition.

The defendants assert that Nurse Walker placing Craig on the list to see the dentist shows

that there was no deliberate indifference on their part.  (DE 101 at 12, 13.) However, placing

Craig on a list to be seen by the dentist is not what is at issue here. What is at issue is the alleged

lack of care for the two months he had to wait to be seen by the dentist. Taking the facts in a

light most favorable to Craig, between December 16, 2012 until February 1, 2013, he made

numerous complaints to Nurses Walker and Martin regarding his tooth and gum pain. In fact, at

the end of January 2013, Craig's pain had gotten so severe that he could no longer eat. When

inmates are waiting to be seen by the dentist, nurses can give them salt water gargles to reduce

irritation and swelling. And, if an inmate had obvious swelling, redness, or complained of pain,

the dentist can issue a telephone order for antibiotics and Tylenol or ibuprofen. (*Id*.) Despite

these options, and Craig's requests, neither Nurse Walker nor Nurse Martin did anything other

than tell Craig that he had to wait for the dentist. They did not examine him or triage his

condition. These facts, if proven to be true, would allow a jury to find Nurse Walker and Nurse

Martin were deliberately indifferent to Craig's dental treatment. Leaving this condition untreated for nearly two months, when they could have simply given him a salt water gargle, or sought the dentist to provide him with a telephone order for medication, could be considered a dereliction of medical duty. While the nurses dispute Craig ever complained to them or made any such pleas for help, that is merely a genuine dispute to be resolved by a jury. As such, there is a genuine dispute as to whether the nurses had knowledge of his severe dental condition and whether they failed to provide adequate treatment while he was waiting to be seen by the dentist. See *Perez v. Fenoglio*,___F.3d___, No. 12-3084, 2015 WL 4092294 (7th Cir. July 7, 2015) (citing *Berry*, 604 F.3d at 443 (discussing that nurse's can be liable for deliberate indifference where they knowingly disregard a risk to an inmate's health)).

Craig's claims against the other defendants do not fare as well.[3] To start, Craig complains Dr. Al-Shami refused to treat his dental condition. However, Dr. Al-Shami was not responsible for Craig's dental treatment. (Dr. Al-Shami Aff. ¶ 25.) The law permits correctional facilities to divide tasks among their employees. *See Berry*, 604 F.3d at 440; *Burks,* 555 F.3d at 596. This is what the jail did here. Dr. Al-Shami was responsible for medical care and Dr. Carter was responsible for dental care. Because Dr. Al-Shami was not responsible for dental care at the facility, there is no basis to hold him liable for not treating Craig's dental complaints.

---

[3] Notably, in his brief, he complains that Kim House failed to ensure that he was seen by the dentist promptly. (DE 114 at 4.) However, he was not granted leave to proceed against Kim House for failing to provide adequate dental treatment. (DE 13 at 11.) Nevertheless, this claim is without merit. Kim House only had authority to put an inmate on the list to be seen by the dentist. *(Aff. of Kim House, ¶8.)* Because Nurse Walker put Craig on that list, there was no need for Kim House to do so. Moreover, Kim House was not involved in Craig's dental or medical treatment and thus unaware of any circumstances that required anything more than Craig being put on a list to be seen by the dentist. As such, she cannot be deemed deliberately indifferent to Craig's dental needs.

Moreover, while Dr. Al-Shami could see inmates for urgent dental needs while they waited for the dentist, there is no evidence that Craig's condition constituted an "urgent need" or that Dr. Al-Shami perceived Craig to have any such urgent need. Craig only informally complained about his tooth and gums to Dr. Al-Shami while his mental illness was being treated. Craig never made an appointment to see Dr. Al-Shami about these problems. Nor is there any evidence to plausibly suggest that Dr. Al-Shami had reason to believe that Craig's dental problems presented an urgent medical issue requiring him to address it before Craig was seen by a dentist. In fact, after Craig complained about his tooth, he reassured Dr. Al-Shami that he had an appointment to see the dentist at the jail. To that end, there is nothing in the record to suggest Dr. Al-Shami knew Craig had such a long wait to see the dentist. Simply put, there has been no showing of deliberate indifference on the part of Dr. Al-Shami.[4] Ultimately, because Craig's dental problems did not present, or seem to present, an urgent medical need and because Dr. Al-Shami is not responsible for providing dental services, this claim against him must be dismissed.

As to Captain Taylor and Assistant Warden Gaydos, Craig complains how these grievance officers handled his grievances regarding dental treatment. (DE 113 at 5; DE 113-2 at 1.) However, neither of these defendants can not be liable simply because they participated in addressing or denying Craig's grievances. *Burks*, 555 F.3d at 595-96. Prison grievance procedures "do not give rise to a liberty interest protected by the Due Process Clause." *Grieveson v. Anderson*, 538 F.3d 763, 772 (7th Cir. 2008). As a result, Craig's complaints about the grievance process does not state a constitutional claim. *Owens v. Hinsley*, 635 F.3d 950, 953

---

[4] The continuous and overall care that Craig received from Dr. Al-Shami during his stay at the Porter County Jail further weighs against a finding of any deliberate indifference. *Dunigan v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999).

(7th Cir. 2011). And, there is nothing in the record to plausibly suggest that either Captain Taylor's or Assistant Warden Gaydos's actions in any way interfered with or delayed Craig getting treatment.

Finally, in his response, Craig does not argue that Warden Widup acted deliberately indifferent to his dental needs. Indeed, he credits Warden Widup for getting his dental problems evaluated. (DE 113 at 8.) Thus, the claims against him are dismissed.

## C.      Conclusion

For the reasons set forth above, the ACH medical defendants' motion for summary judgment (DE 106) is **GRANTED**. The State defendants' motion for summary judgment (DE 100) is **GRANTED in part and DENIED in part**. To the extent it seeks summary judgment in favor of Nurse Walker and Nurse Martin for failing to provide Craig with adequate dental care, the motion is **DENIED**. It is **GRANTED** in all other respects.

The clerk is **DIRECTED** to enter judgment in favor of defendants Warden John Widup, Captain Ron Taylor, Assistant Warden Ron Gaydos, Michelle Harris, Kim House, Dr. Al-Shami and Advanced Correctional Healthcare.

Craig's claims that Nurse Walker and Nurse Martin failed to provide him adequate dental care remain pending. Craig has previously sought to be appointed counsel and expressed concern about handling pretrial and trial proceedings on his own. (DE 71.) At the time, those concerns were premature. Now that Craig has passed the summary judgment stage, the Court is willing to re-examine whether an appointment of counsel is warranted, should he choose to renew his request for counsel.

24

**SO ORDERED** on September 2, 2015.

 Joseph S. Van Bokkelen 
Joseph S. Van Bokkelen
United States District Judge